## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA**,

v.

**JOSÉ SILVA-RENTAS**, *et al.*,

Defendants.

Criminal No. 14-0387 (PAD/BJM)

### REPORT AND RECOMMENDATION

Julio Colón-Maldonado ("Colón") was charged with possession of a firearm by a convicted felon, possession of cocaine with intent to distribute, and possession of a firearm in furtherance of a drug trafficking crime. Docket No. 19. In the same indictment, José Silva-Rentas ("Silva") was charged with possession of a machine gun and two counts of possession of a firearm by a convicted felon, one for aiding and abetting Colón. *Id.*[1] Colón and Silva (collectively, "defendants") jointly moved to suppress various pieces of physical evidence recovered directly and indirectly from their arrests on May 29, 2014. Docket No. 126 ("Mot."). The government opposed, Docket No. 140 ("Opp."), and defendants replied, Docket No. 142. The matter was referred to me for a report and recommendation, preceded, if necessary, by a hearing. Docket No. 141. A hearing was held on March 12, 2015. Docket No. 170. For the reasons below, I recommend that defendants' motion be **granted in part and denied in part**.

### BACKGROUND

The following account is drawn from the evidence, testimonial and documentary, received at the suppression hearing. The government presented testimony from Rafael Vázquez Ocasio ("Vázquez"), a Puerto Rico Police Department ("PRPD") officer assigned to the department's Homeland Security Investigations ("HSI") task force, and William Marrero Rivera ("Marrero"), an HSI agent. Defendants presented testimony from Iván

---

[1] Also charged in the indictment were Luis Delgado-Miranda and Hector Orta-Castro. *Id.* The counts against Delgado-Miranda were dismissed without prejudice. Docket No. 163. Orta-Castro is not party to the instant motion.

Alemán-Ruiz ("Alemán"), Enrique Román-Román ("Román"), and Mario Rivera-Ramírez ("Rivera").

On May 29, 2014, one Juan Clemente, an HSI agent, received information from a confidential source about a potential impending drug deal. Because Clemente did not testify at the hearing, the precise details of the informant's tip are less than clear. According to Vázquez, Clemente's source told him that a white Toyota Sequoia was currently on its way to the Navarro ward of Gurabo because of the possibility of a drug transaction; Clemente also mentioned Silva by his nickname, "Cheo." Marrero similarly testified that his supervisor, who referred to the source as reliable, told him the Sequoia was probably going to be involved in a drug deal in Navarro.

Six agents, including Clemente, Vázquez, and Marrero, made their way to Navarro, arriving around 3:00 or 4:00 p.m., and drove around looking for a white Sequoia. The agents took three separate cars, in one of which were Vázquez and Marrero. They were not equipped with a warrant. At some point, Clemente told Vázquez and Marrero over radio that he had seen the Sequoia enter a particular area and instructed the agents to do the same.

The area in question has a single, gated entrance and is bounded on all sides by low concrete walls. *See* Defs.' Exs. A–C, J. The gate opens onto an unpaved lot; at the lot's far end stands a warehouse, identified as such by signage. *See* Defs.' Ex. D. To the back left of the warehouse, not immediately visible from the entrance, are boarding stables for horses and a small, grassy expanse. *See* Defs.' Exs. I, K–M. The lots, the warehouse, and the stables are all owned by Alemán, who was not present at the time. *See* Docket No. 169-2. Alemán also owns several commercial properties on the street abutting the gated area, which he rents out to various small businesses. *See* Defs.' Ex. C. The area's main lot is used for parking by the owners and employees of these businesses. Customers and other members of the public are not authorized to use the lot—hence the gate. There are spaces for customer parking both around the corner and across the street from the gate. *See* Defs.' Exs. A–B. Alemán testified that the gate is open during shift changes but closed the rest of the time; generally, it is open

in the morning and afternoon. Access to the stables is further restricted. Only Alemán himself, his father, the manager of the stables, and clients who rent out space for their horses are permitted to enter. Colón is such a client; he is therefore authorized to enter the premises. Alemán opined that, on this occasion, he was likely present to make his monthly rental payment. He is allowed to bring guests; Alemán testified that clients like Colón sometimes bring one or two people to show them their horses.

When the agents reached the area, the gate was open. Nobody was in the main lot. Clemente, Vázquez, and a third agent immediately entered through the gate and ran toward the stables, their guns drawn, announcing their presence and yelling "halt" or "stop." In the grassy area beside the stables, several individuals, including Colón and Silva, were standing in front of various parked cars, including a white Toyota Sequoia.[2] Most of the gathered individuals immediately dropped to the ground in submission. Colón, however, ran, and Vázquez gave chase. During the ensuing pursuit, Colón pulled from his waistband a black Glock pistol and tossed it over the surrounding cement wall; it was later recovered by Vázquez. *See* Gov.'s Exs. 7–9, 12. Vázquez swiftly apprehended Colón and placed him under arrest.

Silva and the other already surrendered individuals were at that point also formally arrested, and everyone was searched. On Colón, the agents found two IDs bearing false names; on Silva, $7,000 in cash, 120 pills (of an unspecified type), seven cell phones, and two false IDs. *See* Gov.'s Exs. 24, 26. Silva also had, attached to a necklace, what Vázquez

---

[2] The government suggests that the agents announced themselves and ordered the individuals to stop only after observing the presence of Silva, whom they recognized as a well-known drug trafficker and convicted felon. Opp. 3. Vázquez, however, testified that as he ran into the stables area, following Clemente, he drew his gun and yelled "halt" without taking note of any specific facts, and that Silva was unknown to him prior to the events of this case. Marrero did not testify that he knew of or recognized Silva. The government also claims that Alemán's property was known to the agents as a drug trafficking site. *Id.* 2–3. But Vázquez testified that he had no prior experience with the property, and Marrero's testimony suggested the same. Vázquez did testify that he knew the general area of Navarro where the property lies, "more or less," to be "dangerous." He also testified that the agents knew "the kinds of organizations that were located in that area, and that they were dangerous," but did not specify that these "organizations" were involved in drug trafficking.

and Marrero referred to as a "beeper" used to remotely unlock an Acura vehicle.

Several PRPD officers arrived on the scene to inspect the cars parked by the stables. A K-9 unit alerted to the presence of narcotics in six of the cars, including a white Toyota Tundra belonging, according to Marrero, to Colón. *See* Gov.'s Ex. 12. In addition, one of the Tundra's door's was open, and through it the officers were able to see an ammunition magazine and a baggie of what appeared to be marijuana, both stowed in an unzipped black leather pouch on one of the seats. *See* Gov.'s Ex. 16. The six cars were impounded.

HSI Task Force agents set out to find the Acura associated with the beeper seized from Silva; Marrero testified that they were told by local police to look in a particular part of Navarro. The agents went to that general area and, according to Vázquez, pressed the beeper every time they saw an Acura, in an effort to identify the correct car. They eventually found it, parked on the street about 1,110 yards from the scene of arrest. According to Marrero, a K-9 unit alerted positively to the presence of narcotics, and the Acura was impounded.

Román and Rivera live in neighboring apartments on the street where the Acura was found. Román, a tattoo artist who is passingly acquainted with Colón, testified that he was outside his apartment when PRPD officers pulled up behind the Acura. Before he left the area with his family about 15 or 20 minutes later, he saw the officers approach the car, examine its plates, and open its trunk, apparently by using the beeper. Rivera, an out-of-work construction worker and Colón's cousin, gave similar testimony. When the officers stopped by the Acura just down the street from his apartment, he was sitting on his balcony. He went inside for a bit and, when he came back out, saw an officer looking into the car through an open door. Other officers arrived and brought a K-9 unit to the car. Rivera testified that the dog gave no visible reaction. A tow truck arrived and took the car away.

Search warrants were obtained for all the impounded cars, including the Tundra and the Acura. *See* Gov.'s Exs. 51, 53–57. From the Tundra, agents recovered approximately 134 grams of cocaine, a small amount of marijuana, 20 rounds of .40-caliber ammunition, a Glock pistol magazine, multiple cell phones, an iPad, multiple remote beepers for gates or

garage doors, and miscellaneous documents. From the Acura, agents recovered two Glock pistols, two Glock 9mm magazines, 50 rounds of 9mm ammunition, two cell phone chargers, two remote beepers, two sets of keys, multiple cell phones, a small amount of cash, and miscellaneous documents.

## DISCUSSION

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. In general, an affront to this guarantee calls for application of the exclusionary rule: evidence that the government obtains by violating a defendant's Fourth Amendment rights may not be introduced against that defendant at trial. *See Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978); *United States v. Camacho*, 661 F.3d 718, 724 (1st Cir. 2011) (citing *Terry v. Ohio*, 392 U.S. 1, 12 (1968)). Defendants here claim that their rights were violated several times over by what they characterize as a sequence of unreasonable searches and seizures. I consider each potential Fourth Amendment event in turn.

### I.       Warrantless Entry of Alemán's Property

Defendants first argue that the agents' warrantless entry into the stables area constituted an unreasonable search. Though their motion is less than clear both as to the legal ramifications of this alleged constitutional violation and as to the particular evidence sought to be suppressed, defendants apparently contend that the warrantless entry tainted everything that followed, and that consequently all the evidence eventually obtained should be excluded at trial. The government argues that, whether or not the entry was lawful, defendants lack standing to object to it: because they had no legitimate expectation of privacy in the open lot adjoining the stables, there was no violation of their personal Fourth Amendment rights.

Defendants bear the burden of establishing that their "own Fourth Amendment rights were violated by the challenged search." *United States v. Rheualt*, 561 F.3d 55, 58–59 (1st Cir. 2009) (quoting *Rakas*, 439 U.S. at 131 n.1). To complain about the agents' warrantless entry, defendants must show at the outset that they personally possessed a

"legitimate expectation of privacy" in the area adjoining the stables. *Id.* at 59; *see Minnesota v. Carter*, 525 U.S. 83, 88 (1998) ("[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable."). A two-part inquiry governs the question of defendants' legitimate expectation of privacy: first, whether they "exhibited an actual, subjective expectation of privacy; and second, whether such subjective expectation of privacy is one that society is prepared to recognize as reasonable." *Rheault*, 561 F.3d at 59 (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

Defendants may well have harbored a subjective expectation of privacy in the grassy lot by the stables. After all, it is difficult to imagine why, were that not so, they would choose to stage there what appears (from the current vantage, taking into consideration the evidence obtained in the searches now challenged) to have been at least the prelude to a drug transaction. But such a subjective expectation is not enough; the determinative question is whether it was objectively reasonable. The First Circuit has identified several factors relevant to this analysis: "ownership, possession and/or control; historical use of the property searched or the thing seized; ability to regulate access; [and] the totality of the surrounding circumstances." *United States v. Mancini*, 8 F.3d 104, 109 (1st Cir. 1993).

First, though Colón, as a horse owner, had the right to access the lot beside the stables and the right to bring Silva and others as guests, neither defendant owns or controls the property. This fact militates against a finding that they had a legitimate expectation of privacy. While one need not own property to have an interest in it sufficient to contest a search, *see, e.g.*, *Minnesota v. Olson*, 495 U.S. 91, 98–99 (1990), it certainly helps, and the mere fact of lawful presence—a defendant's status as a guest or invitee—is not itself enough to make an expectation of privacy objectively reasonable. *Rakas*, 439 U.S. at 148. This is especially true given the nature of the premises here. A guest may enjoy a reasonable expectation of privacy in another's home if he has more than a fleeting connection to the property. *Olson*, 495 U.S. at 98 ("[A]n overnight guest has a legitimate expectation of

privacy in his host's home."); *Jones v. United States*, 362 U.S. 257, 259 (1960) (recognizing the standing of a guest who had stayed "maybe a night" in a friend's house, had a key, and kept possessions there). But the calculus changes, and more is required, when one is a guest somewhere other than a private dwelling. *Carter*, 525 U.S. at 83. "An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home." *Id.* (quoting *New York v. Burger*, 482 U.S. 691, 700 (1987)); *see also Rakas*, 439 U.S. at 148 ("[C]ars are not to be treated identically with houses . . . for Fourth Amendment purposes"). Colón's relationship with the lot adjoining the stables—and, indeed, with the stables themselves—is purely commercial; Silva's relationship is, so far as the record reveals, entirely derivative of Colón's.

Second, with respect to defendants' "historical use of the property searched," there is no evidence in the record that Silva had ever been on the premises in the past. He has shown no connection to the stables area more significant than that of a one-time business invitee and, therefore, lacked a legitimate expectation of privacy. *See Carter*, 525 U.S. at 91. Colón, on the other hand, was connected to the area through an ongoing commercial relationship. While it is unclear exactly how long he had kept horses in the stables, or how often he went there, Alemán suggested that he visited the property once a month to pay for boarding. This pattern of regular, though relatively infrequent, visitation weighs slightly in favor of a finding that Colón had a legitimate expectation of privacy in the area in question.

Third, and here most significant, defendants had no "ability to regulate access" to the premises. Certainly, according to Alemán, access was technically regulated: only the owners and employees of various nearby businesses were allowed past the outer gate onto Alemán's property, and the stables area behind the warehouse was further restricted to those who worked or kept horses there. But there is no evidence that defendants themselves exercised any measure of control. Unlike in *United States v. Moscatiello*, 771 F.2d 589, 601 (1st Cir. 1985), where the defendants (and one defendant's brother) had the only keys to a warehouse that they kept locked, Colón and Silva had no way to ensure that their use of the area was

exclusive. The record does not suggest that Colón was Alemán's sole client. His right to access the stables and the adjoining lot was therefore one he presumably shared with strangers—any other persons who kept horses there. His interest in the property was analogous to that of apartment dwellers in the common areas of their buildings, areas that all tenants may in kind access by virtue of their contractual relationship with the landlord. There is no legitimate expectation of privacy in such areas. *Rheault*, 561 F.3d at 61; *United States v. Hawkins*, 139 F.3d 29, 32–33 (1st Cir. 1998); *United States v. Cruz Pagán*, 537 F.2d 554, 557–58 (1st Cir. 1976). While the First Circuit has not addressed whether this is true even where the area in question is locked or otherwise inaccessible to non-tenants, the great majority of other circuits to have considered the issue have answered in the affirmative. *United States v. Correa*, 653 F.3d 187, 190–91 (3d Cir. 2011) (collecting cases). Because "a potentially revolving cast of [horse owners] and their guests had relatively unfettered access to" the stables, *Rheault*, 561 F.3d at 61, this factor strongly suggests that any expectation of privacy defendants had in the area at issue was objectively unreasonable.

One final factor points toward the same conclusion: "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967). Despite Alemán's testimony that his property was closed to the public, the record suggests that this policy was enforced less than rigorously. Alemán testified that the gate is open only during shift changes, but it was open when the agents arrived, and at that time there were no employees in the main lot. There do not appear to have been any signs that access is restricted. While the area where defendants were arrested was, like the rest of Alemán's property, surrounded by a cement wall, it was unenclosed—that is, open-air—and thus in clear view to any member of the public who walked through the gate and toward the warehouse. Even if such persons might technically be trespassing, it would not have been reasonable for defendants to suppose that they would enjoy absolute privacy due to what appears to have been, at best, an unwritten rule, and, at worst, an unenforced and unenforceable preference on the part of Alemán.

*Compare, e.g.*, *United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006) ("The absence of a closed or blocked gate in this country creates an invitation to the public."), *with, e.g.*, *United States v. Brien*, 617 F.2d 299, 306 n.9 (1st Cir. 1980) ("[U]nlike normal business offices, Lloyd, Carr's Boston office was a citadel of security. In part to protect salesmen from angry customers, the door to the sales floor and management offices was locked from the inside. . . . Lloyd, Carr went to great lengths to keep its methods of operation secret.").

Having considered the totality of the circumstances, I conclude that defendants did not enjoy a legitimate expectation of privacy in the stables area. The only factor in defendants' favor, Colón's history with the property, is dwarfed by evidence that they could not reasonably expect to operate there in secret. Defendants may not contest the agents' entry, and I therefore do not consider whether it was reasonable under the Fourth Amendment.

## II.    Arrest and Search Incident to Arrest of Colón

Because Colón lacked a legitimate expectation of privacy in the lot adjoining the stables, he may not object to his seizure and the subsequent search of his person on the ground that those intrusions were the fruits of the agents' unlawful entry. *See generally Wong Sun v. United States*, 371 U.S. 471, 484–488 (1963). However, he may—and does—object to the seizure and search themselves as violations of the Fourth Amendment.[3]

He argues, first, that he was unlawfully seized when the agents entered the lot with their guns drawn and ordered him, along with the others gathered in the area, to yield, and that this seizure was unreasonable. Whether or not the agents' conduct was reasonable, this argument fails. No "seizure" within the meaning of the Fourth Amendment occurs absent either an application of physical force by the police or a suspect's actual submission to an

---

[3] For the sake of clarity, I refer to these objections, and their supporting arguments, as Colón's. In fact defendants' motion does not clearly distinguish Colón's arguments from Silva's. But because Silva has not demonstrated any interest in Colón's person or effects, the arrest and search of Colón could not have violated Silva's own Fourth Amendment rights, and Silva therefore cannot challenge them.

assertion of police authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *United States v. Sealey*, 30 F.3d 7, 9–10 (1st Cir. 1994). The agents did not touch Colón when the first entered the area, and Colón did not submit to their show of authority; instead, he elected to flee.

Colón next takes issue with his arrest and the search of his person that followed. Because the agents acted without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that their conduct was constitutional. 6 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.2(b)–(c) (5th ed. 2012). Warrantless arrests do not violate the Fourth Amendment when conducted "in a public place upon probable cause." *United States v. Santana*, 427 U.S. 38, 42 (1976). Though, as discussed, Colón was arrested on private property, he had no legitimate expectation of privacy in the premises and so was "in a public place" for Fourth Amendment purposes. *Id.* The question is therefore whether there was probable cause to arrest, which "exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." *United States v. Young*, 105 F.3d 1, 6 (1st Cir. 1997).

In many cases this is a slippery standard, difficult to apply—not so here. When Colón pulled a gun from his waistband, he committed a criminal offense. Under Puerto Rico law, the visual display of a firearm—even one lawfully possessed—is a crime. 25 L.P.R.A. § 456a(d)(1); *United States v. Avilés-Vega*, No. 13-2362, 2015 WL 1611799, at *6 (1st Cir. Apr. 13, 2015); *United States v. Padilla-Colón*, 578 F.3d 23, 25 n.1 (1st Cir. 2009). Vázquez saw Colón take out the gun and thus had first-hand knowledge of grounds for his arrest. Alternatively, Colón's flight and his act of discarding the gun provided the agents with probable cause to believe he had committed and was attempting to conceal some other firearm-related offense—for example, possession of a firearm by a convicted felon, 18 U.S.C. § 922(g)(1), or possession of a firearm without a license, 25 L.P.R.A. § 458e. *See Sealey*, 30 F.3d at 10 n.2 (finding probable cause to arrest "for violating firearm laws" a

defendant who fled from police and discarded a gun during the chase).

Because Colón's arrest did not violate the Fourth Amendment, the search of his person was also constitutionally permissible. "If an arrest is lawful, the arresting officers are entitled to search the individual apprehended pursuant to that arrest." *United States v. Uricoechea-Casallas*, 946 F.2d 162, 165 (1st Cir. 1991); *see United States v. Robinson*, 414 U.S. 218, 234–36 (1973) (holding that officers possess a "general authority to search incident to a lawful custodial arrest"). The evidence obtained from the search was therefore not, as Colón contends, the fruit of an illegal arrest or search, and should not be suppressed.

### III.      Recovery of Colón's Gun

The agents lawfully recovered the gun Colón tossed over the wall. Colón "had abandoned [the gun]. He had thrown [it] away. . . . There can be nothing unlawful in the Government's appropriation of such abandoned property." *Abel v. United States*, 362 U.S. 217, 241 (1960); *see also Hester v. United States*, 265 U.S. 57, 58 (1924) ("The defendant's own acts . . . disclosed the jug, the jar and the bottle—and there was no seizure in the sense of the law when the officers examined the contents of each after it had been abandoned."). The gun should therefore not be suppressed.

### IV.      Arrest and Search Incident to Arrest of Silva

Like Colón, Silva was searched without a warrant, and the government must therefore prove by a preponderance of the evidence that his search was nonetheless lawful. 6 Wayne R. LaFave, *supra*, § 11.2(b)–(c).

#### A.      Reasonable Suspicion for Stop and Frisk

The government first argues that the agents were entitled to detain and frisk Silva and the other gathered individuals based on a reasonable suspicion that they were involved in criminal activity. This argument misses the mark. A law enforcement officer may, of course, "conduct a brief investigatory stop if he has a reasonable, articulable suspicion that criminal activity is afoot," *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004) (citing *Terry*,

392 U.S. at 30), and "[i]f he has a reasonable basis to suspect that the subject of his inquiry may be armed, he also may frisk the suspect" for weapons, *United States v. Cook*, 277 F.3d 82, 85 (1st Cir. 2002). A frisk justified by reasonable suspicion, however, must be "confined in scope to an intrusion reasonable designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29. Silva was subjected to more than a limited pat-down aimed at the detection of weapons; the agents conducted a full-blown search of his person. That search was permissible only if incident to a lawful arrest, and Silva's arrest was lawful only if based on probable cause. *Santana*, 427 U.S. at 42; *Uricoechea-Casallas*, 946 F.2d at 165.

### B.    Probable Cause for Arrest and Search

"The inquiry into probable cause focuses on what the [arresting] officer[s] knew at the time of the arrest, and should evaluate the totality of the circumstances." *United States v. Vongkaysone*, 434 F.3d 68, 73 (1st Cir. 2006) (citation omitted). As noted earlier, the ultimate question is whether at the relevant time the officers possessed "information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." *Young*, 105 F.3d at 6. I begin by briefly recounting the relevant facts at the agents' disposal at the time of the arrest.[4] A confidential informant told the agents about the possibility of an impending drug transaction in Navarro, involving one "Cheo" Silva and a white Toyota Sequoia. In a high-crime area of Navarro, they saw a vehicle matching that description enter Alemán's property. By the stables, they found several individuals talking in front of various parked cars, including the Sequoia.[5] One of these individuals, Colón, fled

---

[4] It is unnecessary to identify precisely which facts were known to which individual agents on the scene because of the "collective knowledge" or "pooled knowledge" principle, according to which the proper "focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation." *United States v. Barnes*, 506 F.3d 58, 62 (1st Cir. 2007) (quoting *United States v. Fiasconaro*, 315 F.3d 28, 36 (1st Cir. 2002)).

[5] Though Vázquez did not testify that he saw the Sequoia, at the hearing the government introduced a photograph of the arrest scene, Gov.'s Ex. 3, in which can be seen a white Toyota that Marrero identified as the Sequoia in question. It is reasonable to assume that Clemente, upon entering

and discarded a gun. For Silva's arrest to have been lawful, these facts, considered together, must have been enough to "warrant a man of reasonable caution in believing that" Silva had committed a crime. *Valente v. Wallace*, 332 F.3d 30, 32 (1st Cir. 2003) (quoting *Beck v. Ohio*, 379 U.S. 89, 96 (1964)) (internal quotation marks omitted). I conclude that they were not.

The government makes much of Colón's unwise response to the agents' arrival, arguing that his evasive (and criminal) conduct not only gave rise to probable cause for his arrest, but also provided the agents with grounds to arrest Silva and the other individuals in the area. But probable cause as to one individual does not necessarily extend, as though by osmosis, to those in his company. It "must exist with respect to each person arrested, and 'a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to [arrest and] search that person.'" *United States v. Martínez-Molina*, 64 F.3d 719, 726 (1st Cir. 1995) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). Generally, there must be "substantially more than a momentary, random, or apparently innocent association between the defendant and the known criminal activity." *Id.* at 727.

If Colón's display or presumably illegal possession of a firearm is the only "known criminal activity" considered, that was simply not the case. The agents had no reason to believe that Silva and the other men gathered by the stables had any connection to, or even awareness of, those crimes. As far as the agents knew, the men had been standing together and talking for mere moments before Colón took flight and discarded his gun. And Colón was not involved in criminal activity so blatant that the involvement or awareness of those associating with him might reasonably be presumed; he was not, for example, openly handling large quantities of narcotics. *See id.* at 729 ("[I]t strains credulity to suggest that the cocaine transaction was being carried on without the knowledge of all persons present.").

---

the stables area, recognized the Sequoia that he had spotted only moments earlier and followed onto the property, and his knowledge that the car was present may be imputed to the agents involved in the arrests. *See Barnes*, 506 F.3d at 62.

The fact that the gathering took place in a dangerous area of Navarro, as Vázquez testified, though properly taken into account, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), does not meaningfully alter the calculus. Based on the nature of the area and Silva's apparent relationship with Colón, who before discarding his firearm had been armed, the agents may well have had reasonable suspicion sufficient to justify frisking Silva. *See, e.g.*, *United States v. Tiru-Plaza*, 766 F.3d 111, 120–22 (1st Cir. 2014) (finding reasonable suspicion to frisk vehicle passenger where vehicle stopped at late hour in high-crime area, driver was in possession of gun, and reasonable suspicion that driver had stolen vehicle). But reasonable suspicion is not probable cause. The area's unsavory character could not, without more, transform an otherwise "apparently innocent association" into something so "substantially more" incriminating, *Martínez-Molina*, 64 F.3d at 727, as to support a reasonable belief that Silva was complicit in Colón's observed or reasonably presumed crimes or involved in criminal activity of his own.

My analysis to this point has focused exclusively on Colón's firearm-related crimes. There is, however, more to the story: the agents converged on the stables area in the first place because they suspected that a drug transaction was underway or imminent. If, when they first entered the area, the agents had probable cause to believe that the individuals by the stables were involved in drug trafficking, they could, of course, have arrested and searched them all. And if no such probable cause existed at the moment of entry, it might yet have developed once Colón fled and discarded his gun. Because, at the time of the arrests, the agents had observed no drug-related activity, the case for drug-specific probable cause depends on the tip received by Clemente's confidential source. I therefore now consider the extent to which the tip provided the agents with grounds to believe that Colón and Silva were engaged in a drug transaction.

"[A] probable cause finding may be based on an informant's tip so long as the probability of a lying or inaccurate informer has been sufficiently reduced." *United States v. Greenburg*, 410 F.3d 63, 69 (1st Cir. 2005). The First Circuit has identified several factors to

guide the examination of a tip's dependability, including: (1) whether there is "a sufficient basis for crediting the informant's reliability and his basis for knowledge of the facts supplied," *United States v. Croto*, 570 F.3d 11, 14 (1st Cir. 2009); "(2) whether [the] informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable (e.g., through police surveillance); and (4) whether a law enforcement [officer] assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information," *United States v. Gifford*, 727 F.3d 92, 99 (1st Cir. 2013). "None of these factors is indispensable; thus, stronger evidence on one or more factors may compensate for a weaker or deficient showing on another." *United States v. Zayas-Díaz*, 95 F.3d 105, 111 (1st Cir. 1996).

Though Marrero cursorily testified that his supervisor characterized Clemente's confidential source as reliable, "[a] mere assertion of reliability without any information regarding the basis for the officer's belief, such as past tips leading to arrests, is entitled to only 'slight' weight." *United States v. Barnard*, 299 F.3d 90, 93 (1st Cir. 2002) (quoting *United States v. Khounsavanh*, 113 F.3d 279, 286 (1st Cir. 1997)). The record does not reveal how Clemente established a relationship with the informant, whether the relationship was preexisting, or even whether Clemente knew the informant's identity. *Compare Gifford*, 727 F.3d at 100 (finding insufficient basis for determining reliability where no information about positive history with informant or nature of relationship), *with United States v. Barnes*, 492 F.3d 33, 37 (1st Cir. 2007) (finding sufficient that informant supplied information leading to several past arrests), *and Barnard*, 299 F.3d at 93 (finding sufficiently reliable a tipster who "was known to police and could be held responsible if his assertions proved inaccurate or false").

The government similarly failed to adduce any evidence as to how the source came to know the information he furnished—for example, that he had personally been involved in planning the coming criminal transaction, or that he had heard tell of it from others

United States v. Silva-Rentas, Criminal No. 14-0387 (PAD/BJM)                    16

personally involved. *See Gifford*, 727 F.3d at 100; 2 LaFave, *supra*, § 3.3(d). "There was no indication that the tip . . . was contemporaneous with the observation of criminal activity." *Navarette v. California*, 134 S. Ct. 1683, 1689 (2014); *see Avilés-Vega*, 2015 WL 1611799, at *10–11 (finding anonymous tip sufficient to provide reasonable suspicion for traffic stop where caller reported recent first-hand observation of crime). And the tip was not "self-verifying" or "self-authenticating"—that is, "so sufficiently specific that it was likely obtained from personal observations or from a person's statement to the informant that was against his penal interest." *Gifford*, 727 F.3d at 100. To be self-authenticating, a tip must be detailed enough to indicate that the police are "relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli v. United States*, 393 U.S. 410, 416 (1969). Particularly useful in this regard are predictions of a person's future activities that demonstrate "inside information—a special familiarity with [the accused's] affairs." *Alabama v. White*, 496 U.S. 325, 332 (1990).

Though the tip here involved predictions of future conduct, they were not detailed enough to permit an inference that the informant's basis of knowledge was sound. The informant told Clemente simply that a white Toyota Sequoia was on its way from one city to another, where its occupants would possibly engage in a drug deal, and that Silva was somehow involved. That a particular vehicle is currently in transit is not a detail that could be known only by one with uncommon insights into the activities of third parties. *See White*, 496 U.S. at 332 (discounting anonymous tipster's "prediction" that a particular car would be found at a particular location because that fact "was a condition presumably existing at the time of the call"). The tip did not provide any specifics about the Sequoia's itinerary more likely available only to those in the know—for example, where in Navarro, exactly, it was going. *See id.* at 327, 332 (tip stated that a woman would leave in a particular car from a particular location at a particular time and drive to a particular location). Nor did it contain any detail at all about the precise nature of the prospective drug deal. *See id.* (tip stated that

woman would be carrying an ounce of cocaine in a brown attaché case).[6] Indeed, the tip was rather shaky even as to whether this vaguely described deal would take place at all; Vázquez and Marrero testified that the informant forecasted merely *the possibility* of a drug deal. If the tip's level of detail was suggestive of anything, it is that the informant lacked intimate knowledge of imminent criminal activity. One would think that, had he come by solid information through reliable means, he would have been able to tell Clemente more than that *some kind* of drug transaction *might* soon be occurring *somewhere* in Navarro.

All this would matter less had "corroboration through other sources of information reduced the chances of a reckless or prevaricating tale." *Illinois v. Gates*, 462 U.S. 213, 244–45 (1983) (quoting *Jones*, 362 U.S. at 271). "Because an informant is right about some things, he is more probably right about others," *id.* at 244, and thus a tip otherwise lacking in indicia of reliability may be rehabilitated by verification of its details through independent police investigation, *Gifford*, 727 F.3d at 99. Here, to be sure, after some time driving around Navarro, the agents came upon a white Toyota Sequoia, just as the informant predicted. Particularly given the factors already discussed, however, this was not enough to establish that the tip as a whole was reliable. *See White*, 496 U.S. at 330 ("[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable."). It would be one thing had the agents found a white Sequoia at a particular location specified by the informant, or had the informant provided some way to distinguish the particular white Sequoia he spoke of from every other white Sequoia. *See, e.g.*, *Avilés-Vega*, 2015

---

[6] The issue in *White* was whether an informant's partially corroborated tip was sufficient to endow the police with reasonable suspicion to effect a vehicle stop—not, as here, whether the tip provided probable cause, a more demanding standard. 496 U.S. at 326–29. This distinction matters because "[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Id.* at 330. The Court ultimately held that the tip, as corroborated, was sufficiently reliable to establish reasonable suspicion, but noted that it was a "close case." *Id.* at 332. Less was required of the tip in *White* than is required of the tip here; the tip here is less detailed than the tip in *White*.

WL 1611799, at *10, 14 (tipster told police car's color and model, last three digits of license plate, that car had broken taillight, and that car carried four occupants, all verified by police at scene). In fact, though, the informant gave the agents only a general description of the target vehicle and told them only that it would be somewhere in Navarro. The agents ran into the correct car only, it appears, through a stroke of good fortune. Even after spotting *a* white Sequoia, the agents could not reasonably have been confident that it was *the* white Sequioia the informant had described.[7] As the agents converged on the stables, then, the tip had been, at best, only minimally corroborated. Given its deficiencies, the tip could not, by itself, have provided the agents with probable cause to believe that those gathered in the area were engaged in drug activity.

It might be argued, however, that Colón's subsequent actions were enough to tip the scales in the government's favor. It is true that Colón's evasive behavior strongly suggested that, as the informant claimed, he was involved in something illegal. *See Wardlow*, 528 U.S. at 124 ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive as such."). And his possession of a gun jibed well with the particular type of crime the informant foretold. *See United States v. Caggiano*, 899 F.2d 99, 103 (1st Cir. 1990) ("It is now recognized by us and other circuits that firearms are one of the tools of the trade of drug dealers."). But these facts get the government only so far. Based only on the tip and their location of the Sequoia, the agents did not, when they entered the area, have probable cause to believe that whoever they found inside was involved in criminal drug activity. Colón's actions, as well as the dangerous nature of the area, made it somewhat more likely that the individuals they came upon were in fact those whom the informant sought to incriminate. It was also, in turn, made

---

[7] Had the agents, after entering the stables area, recognized Silva, whom the informant had specifically named, this might have given them reason to believe that the Sequoia was the very one described, and that the gathered individuals were those that the informant had claimed were involved in a potential drug deal. As discussed, however, *supra* note 2, the government introduced no testimony that this was the case.

somewhat more likely that the informant had a reliable basis for predicting the possibility of a drug transaction, and, again in turn, somewhat more likely that this possibility had in fact been realized. But at this point the agents were dealing with probabilities stacked atop other probabilities, each level resting on an ever shakier foundation. With the exception of a white Sequoia's general presence in Navarro, nothing in the tip had been corroborated. The agents did not observe anything specifically indicating a drug-related crime. Though the totality of the circumstances almost surely provided grounds for reasonable suspicion, I am unconvinced that the information in the agents' possession was sufficient to support a reasonable belief that the crime predicted by the informant had occurred or was occurring. I thus conclude that the agents lacked probable cause to believe that the individuals gathered by the stables were engaged in a drug-related crime.

Moreover, even if there was such probable cause as to Colón, it would take a further leap to conclude there was probable cause as to Silva as well. The agents did not see Silva and Colón speaking together for any more than a moment, and they had no way of knowing whether the two had arrived together. *Cf., e.g.*, *Martínez-Molina*, 64 F.3d at 729 (finding probable cause as to group of men who had gathered together and moved in concert at scene of drug transaction). As discussed, the group was not gathered in the sort of private place readily supportable of an inference of complicity. *Compare Ybarra*, 444 U.S. at 91 ("[T]he agents knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when police had reason to believe that the bartender would have heroin for sale."), *with Wyoming v. Houghton*, 26 U.S. 295, 304–05 (1999) ("[A] car passenger—unlike the unwitting tavern patron in *Ybarra*—will often be engaged in a common enterprise with the driver."), *and United States v. Reyes*, 225 F.3d 71, 76 (1st Cir. 2000) ("[T]he officers were reasonable in believing that appellant's presence during and participation in such suspicious activities as the orchestrated entrances into and exits from the house . . . were neither innocent nor ignorant."). Given the lack of evidence connecting the two men, even if the agents had probable cause to arrest Colón for drug

trafficking, that probable cause did not extend to Silva.

Without probable cause, the agents could not lawfully arrest Silva and conduct a full search of his person. The evidence seized as a result of that search, including the Acura beeper, should therefore be suppressed as against Silva.[8]

## V.     Search of the Acura

Because the beeper was seized incident to an unlawful arrest, the contents of the Acura found using the beeper should also be suppressed. "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (citation omitted) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). Suppression of such "fruits" is appropriate as long as they "bear a sufficiently close relationship to the underlying illegality," *New York v. Harris*, 495 U.S. 14, 19 (1990), and the connection between the derivative evidence and the original act is not "so attenuated as to dissipate the taint" imparted by the latter, *Nardone*, 308 U.S. at 341. Here, agents located the Acura—over 1,000 yards away from the stables—by using the beeper recovered from Silva in a search conducted without probable cause. The Acura was quintessentially a fruit of that illegal search, directly related to the underlying illegality.

The warrant obtained following a positive K-9 alert cannot be considered a valid "independent source" of the Acura's search sufficient to dissipate the taint from Silva's arrest. *See Segura*, 468 U.S. at 805. The officers knew to subject this particular Acura to a K-9 inspection only because they "impermissibly exploited . . . illegally seized material in gathering . . . additional evidence." *United States v. Finucan*, 708 F.2d 838, 843 (1st Cir. 1983). "The illegally gained knowledge that [the Acura was connected to Silva] formed the impetus for the use of the detector dog. The dog's alert therefore cannot be considered an

---

[8] Since Silva's arrest and search did not violate Colón's Fourth Amendment rights, the evidence recovered as a result of the search should not be suppressed as against Colón.

independent source which removed the taint of the original illegal search." *United States v. Taheri*, 648 F.2d 598, 600 (9th Cir. 1981). For this reason, the contents of the Acura should be suppressed as against Silva.[9]

## VI.  Search of the Toyota Tundra

It is not entirely clear whether defendants actively seek suppression of the contents of the Toyota Tundra. They specifically request only that "the firearms seized, its [sic] ammunition, as well as any other evidence obtained as a result of the illegal arrest and that of a consequent search and seizure of an Acura Vehicle." Mot. ¶ 3. In any case, suppression of the Tundra evidence would be inappropriate. Because the search was conducted pursuant to a warrant, defendants bear the burden of showing that it was nevertheless unlawful. 6 LaFave, *supra*, § 11.2(b), and they have made no argument to that effect. Defendants have also failed to rebut the government's evidence and argument that the Tundra's initial warrantless seizure was constitutionally permissible. To the extent defendants argue that the seizure was the fruit of an unlawful arrest, the argument fails. There is no evidence that Silva has any interest in the Tundra, and its seizure therefore did not intrude on his own personal Fourth Amendment rights. Because the government presented evidence that the Tundra belonged to Colón, he may object to its seizure, but, because he was arrested upon probable cause, he cannot claim that the seizure was the fruit of his unlawful arrest.

Nor can Colón claim that the warrantless seizure was unreasonable in its own right. Under the "automobile exception" to the Fourth Amendment, "the existence of probable cause justifies a warrantless seizure and reasonable search of a motor vehicle . . . parked in a public place, whether or not exigent circumstances prevailed at either the time of the seizure or the time of the search." *United States v. Panitz*, 907 F.2d 1267, 1272 (1st Cir. 1990). The government has shown that the agents had "probable cause to believe that the [Tundra]

---

[9] The government claims that the Acura is Silva's, and its illegal search therefore violated Silva's Fourth Amendment rights. Colón's own rights were not so violated, however, and the contents of the Acura need not be suppressed as against him.

contain[ed] contraband or other evidence of criminal activity." *Id.* at 1271. PRPD officers saw drugs and ammunition inside the Tundra through an open door, and, moreover, a K-9 unit alerted to the presence of contraband. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (holding that the use of a drug-sniffing dog to investigate a lawfully stopped vehicle does not constitute a "search" implicating the Fourth Amendment); *United States v. Brown*, 500 F.3d 48, 57 (1st Cir. 2007) ("[A] reliable canine sniff outside a vehicle can provide probable cause to search the vehicle.").[10]

## CONCLUSION

For the above reasons, I recommend that the motion to suppress be **GRANTED IN PART AND DENIED IN PART**. The court should order suppression, as against Silva only, of (1) all effects recovered from the search of Silva's person incident to arrest and (2) all effects recovered from the search of the Acura.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within 14 days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**
In San Juan, Puerto Rico, this 21st day of April, 2015.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge

---

[10] Defendants do not challenge the K-9 unit's reliability. *See Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013); *United States v. Owens*, 167 F.3d 739, 749 (1st Cir. 1999). In any case, the officers' plain-view observation of contraband by itself provided the necessary probable cause.